# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

RICHARD DIAB,

    Plaintiff,

v.                                                                                                                     Civ. No. 16-1002 MCA/GJF

FNU BACA, et al.,

    Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court[1] on the "*Martinez* Report" filed by Defendant New Mexico Corrections Department ("NMCD") on October 26, 2017. ECF No. 60. Plaintiff responded to the *Martinez* Report with multiple filings that the Court collectively construes as his Response. *See* ECF Nos. 66, 70, 71, 72, 76, 77, 78. NMCD filed its "Final reply in Support of Their *Martinez* Report" ("Final Reply") on March 2, 2018. ECF No. 79. Several additional motions are currently pending and ripe for review, including NMCD's "Motion to Amend Order Granting Extension of Time to Remove 'John Doe' Defendant from Case Caption" [ECF No. 64], Plaintiff's "Motion [R]equesting the [C]ourt to [R]e[-]enter a Defendant" [ECF No. 65], and Plaintiff's "Motion to Allow the Attached Statement as Addition to Plaintiff's Response to Martinez Report" [ECF No. 71].

For the reasons that follow, the Court **HEREBY RECOMMENDS** that: (1) summary judgment be **GRANTED** to Defendants; (2) all of Plaintiff's remaining claims be **DISMISSED WITHOUT PREJUDICE** for Plaintiff's failure to exhaust administrative remedies; and (3) all other pending motions be **DENIED AS MOOT**.

---

[1] U.S. District Judge M. Christina Armijo referred this case to the undersigned to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend an ultimate disposition of the case. *See* ECF No. 4.

I. **BACKGROUND**

Plaintiff served a brief period of incarceration in the Central New Mexico Correctional Facility ("CNMCF") beginning on August 18, 2016. Def.'s Final Reply 2, ECF No. 79. Plaintiff alleges that prison officials violated his civil rights in that short time by:

(1) issuing him one or more infested and/or unsanitary mattresses;
(2) providing an unsanitary toilet;
(3) failing to provide adequate cleaning supplies or a generally sanitary environment;
(4) failing to provide adequate medical care;
(5) failing to provide adequate means and methods to lodge his grievances; and
(6) by making inappropriate statements to him.

*See* Pl.'s Compl. 3-13, ECF No. 1; Def. NMCD's *Martinez* Report 3, ECF No. 60. Plaintiff demands $12,500 in actual damages and $10,000 in punitive damages. Pl.'s Compl. 14.

On September 26, 2017, the Court ordered Defendants to produce a *Martinez* Report. ECF No. 56. Therein, the Court advised all parties that the *Martinez* Report could be used in several contexts, "**including motions for summary judgment or a *sua sponte* entry of summary judgment**." Order, Sep. 26. 2017, at 1, ECF No. 56 (emphasis in original).

On October 26, 2017, NMCD filed the *Martinez* Report ("Report"). ECF No. 60. The Report contains numerous affidavits,[2] as well as the NMCD's grievance procedures that were in effect at all times pertinent to Plaintiff's Complaint. *See* Def. NMCD's Report, Ex. A at Attachs. 1-4. The NMCD grievance procedure begins with an informal complaint, which an inmate must file within five working days from the date of the incident giving rise to the complaint. *Id.*, Ex. A, Attach. 1 at 1. If the issue is not resolved to the inmate's satisfaction, the inmate may file a formal grievance with the prison's grievance officer within five working days of the conclusion

---

[2] These include affidavits from Orion Stafford, Bureau Chief of the Internal Audits and Standards Committee for NMCD (Exhibit A), Benjamin Lujan, CNMCF Grievance Officer (Exhibit B), Craig Cole, CNMCF Unit Manager (Exhibit C), Rebecca Johnson, NMCD Medical Records Liaison (Exhibit D), Kenneth Smith, Warden of CNMCF (Exhibit E), Steve Madrid, NMCD Grievance Appeals Coordinator (Exhibit F), and Jared Westerfeld, CNMCF Sergeant (Exhibit G). *See* Def. NMCD's Report, Exs. A-G, ECF No. 60.

2

of the informal complaint process. *Id*., Ex. A, Attach. 1 at 2-3. The grievance officer must then investigate the issue and draft a report and recommendation for the warden's review within fifteen working days from receipt of the inmate's grievance. *Id*., Ex. A, Attach. 1 at 4. The warden or a designee will review the grievance, along with any comments from inmates and staff, and make a decision within fifteen working days of receipt of the grievance. *Id.* Finally, if the inmate is not satisfied with the decision of the warden or the warden's designee, the inmate may appeal the warden's decision to the Office of the Secretary of Corrections within five (5) working days of receiving the decision. *Id*., Ex. A, Attach. 1 at 5.

According to Steve Madrid, statewide Grievance Appeals Coordinator for NMCD, "an inmate exhausts his grievance only if and when the inmate pursues the last possible appeal in the grievance policy, to the NMCD Cabinet Secretary or his designee, the Director of Adult Prisons, in Santa Fe." *Id.*, Ex. E at 1. Madrid futher attests that he has searched NMCD's records for the "grievance history of Inmate Richard Diab #72348." *Id.*, Ex. F at 1. These records revealed that "Inmate Diab has not exhausted any grievance by pursuing an appeal to Central Office (the NMCD Cabinet Secretary/Director of Adult Prisons)." *Id.*, Ex. F at 1-2.

The Report also refutes the merits of Plaintiff's allegations and argues in the alternative that NMCD not only investigated Plaintiff's complaints, but responded to each appropriately. *See id.* at 19-26.

Plaintiff acknowledges that he did not exhaust his adminstrative remedies. Pl.'s Mot. to Allow Statements 1, ECF No. 71. He contends that "such remedies were not available [due] to the fact that Defendants denied [P]laintiff the correct forms to file his complaints with regards to the prison conditions he was subject [to]." *Id.*

II. **LEGAL STANDARDS**

3

## A. Summary Judgment Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).

The movant has the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Id.* at 324. Although all facts are construed in favor of the non-movant, the non-movant still has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (citation and internal quotation marks omitted).

The Court liberally construes Plaintiff's filings because he is appearing pro se. Still, a pro se non-movant must "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (citation and internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013).

In a suit brought by a pro se prisoner, a court may order the defendants to investigate the plaintiff's claims and submit a report of that investigation, called a *Martinez* Report. *See Hall v.*

*Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991); *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978). A court may use the *Martinez* Report to grant summary judgment *sua sponte* or upon motion of the defendants. *Hall*, 935 F.2d at 1009–13; *see also Celotex*, 477 U.S. at 326 (courts possess the authority to enter summary judgment *sua sponte*, so long as the losing party is on notice that she must come forward with all her evidence).

B.  **Exhaustion Requirement**

The Prison Litigation Reform Act ("PLRA") provides that prisoners may not bring a suit challenging prison conditions without first exhausting available administrative remedies. 42 U.S.C. § 1997e(a) (2012). The exhaustion requirement applies to all suits brought under federal laws, including 42 U.S.C. § 1983 and the Eighth Amendment. *Id.* § 1997e(b); *see Tuckel v. Grover*, 660 F.3d 1249 (10th Cir. 2011) (requiring exhaustion of available remedies in prisoner's action alleging violation of his Eighth Amendment rights). Further, the exhaustion requirement "applies to all suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Nevertheless, "courts are obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1226 (10th Cir. 2007). Or, as the Supreme Court has recently clarified, administrative remedies may be unavailable in certain circumstances, in which case a prisoner would not be required to exhaust "unavailable" remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016). *Ross* gave three examples of when administrative remedies are unavailable: (1) when "an administrative procedure . . . operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when "an administrative scheme is so

opaque that it becomes, practically speaking, incapable of use;" and (3) "when prison administrators thwart inmates from taking advantage of grievance procedures through machination, misrepresentation, or intimidation." *Id.*

## III. ANALYSIS

As a prisoner at the time of filing, Plaintiff falls squarely within the PLRA's exhaustion requirement. *See* 42 U.S.C. § 1997e(a) (detailing exhaustion requirement); (h) (defining prisoner). Nonetheless, according to both the Report and Plaintiff's own admission, Plaintiff has failed to exhaust NMCD administrative remedies on any of his claims.

### A. Plaintiff's Grievance History

Plaintiff's Complaint alleges a panoply of transgressions by CNMCF employees. *See generally* Pl.'s Compl. 3-13; *see also infra* p. 2. CNMCF grievance records demonstrate a similar zeal on Plaintiff's part, reflecting that Plaintiff submitted grievances on three occasions, and six grievances in total.[3] *See* Def. NMCD's Report 14-17. Yet, despite expending significant effort to submit complaints to both prison officials and this Court, Plaintiff devoted only meager effort to trying to comply with NMCD grievance policies, and no effort toward exhausting them. And despite Plaintiff's assertions that administrative remedies are unavailable to inmates at CNMCF, the record belies his account. *See Ross*, 126 S. Ct. at 1859-60 (holding that prisoners need not exhaust "unavailable remedies"). A review of the facts and cicumstances underlying Plaintiff's grievances evinces why dismissal of Plaintiff's Complaint for failure to exhaust is proper.

---

[3] On the first occasion, Plaintiff filed one grievance. On the second, he filed four separate grievances. On the last, he returned to filing a single grievance. *See* Def. NMCD's Report, Ex B. at 1-3.

6

### 1. First grievance

Plaintiff submitted his first grievance to CNMCF officials shortly after arrival. The undated and hand-written letter stated that "Plaintiff's right to be able to communicate with [his] family [and] attorney [was] being violated" because his housing unit contained only one telephone for the use of twenty inmates. *See* Def. NMCD's Report, Ex B., Attach. 1 at 2. He explained that "[i]f we had 3 phones [then] 20 people would be able to call out daily and [we would] avoid fight[s] and hatred toward each other." *Id.* He warned that if "any fight[s] break out [due] to this then it[']s delib[e]rate indifference [by prison officials]." *Id.*[4]

On August 22, 2016 - just *four days* after Plaintiff arrived at CNMCF - Grievance Officer Benjamin Lujan responded to Plaintiff's first grievance. *See id.*, Ex B., Attach. 1 at 1. Lujan notified Plaintiff that his hand-written grievance would not be reviewed and attached a summary of relevant NMCD procedures detailing an inmate's responsibility to file an informal complaint first, followed by a formal grievance form. *Id.* Lujan even emphasized the words "inmate informal complaint" and "inmate grievance form" with bold script, while also admonishing Plaintiff in the letter's introduction to "[b]e sure to read the in bold messages and comply with them due to [the fact that] if [they are] not done properly – your grievances will not be reviewed." *Id.*

### 2. Second, third, fourth, and fifth grievances

Plaintiff filed his second, third, fourth, and fifth grievances simultaneously on August 24, 2018. *See id.*, Ex. B at 2. The second, which Plaintiff filed as a formal grievance, alleged that Plaintiff's community toilet, "which 20 inmates can use," flushed only once an hour. *Id.*, Ex. B., Attach. 2 at 3. Plaintiff complained that this delay exposed him to "inhuman[e] conditions," and

---

[4] Plaintiff raises no civil rights claim related to telephone usage before this Court. This grievance is recounted here only to demonstrate the evolution of Plaintiff's administrative claims and his knowledge of NMCD grievance procedures.

7

that prison staff were deliberately exposing prisoners to infections including "Hep C, HIV, [and] AIDS." *Id.*, Ex. B., Attach. 2 at 4. Plaintiff requested relief including a medical exam, more toilet paper, access to chemicals and gloves to clean the toilet daily, to speak with "[t]he [l]aw [f]irm of Donetelly and Donetelly to file a claim for this and my other grievance[s]," and lastly, "$5[,]000 for the exposure to waste water." *Id.*, Ex. B., Attach. 2 at 3.

Plaintiff's third grievance - also filed as a formal grievance – complained that on August 19, 2016, he woke up with insect bites on and around his genitals from insects infesting his mattress. *Id.*, Ex. B., Attach. 3 at 3. Plaintiff alleged that he spoke to the correctional officer on duty, a sergeant in the medical line, a lieutenant in the medical line, and a major, and all informed him that they would not procure him a new mattress. *Id.* Additionally, he contended that staff ignored his wishes to be seen by medical staff until August 22, 2016, "until the swelling was down." *Id.*, Ex. B., Attach. 3 at 4. In this instance, Plaintiff requested a new mattress and sheets, chemicals to clean the mattress, tools and paint to remodel his bunk, and "$1,000 for the humiliation[,] suffering[,] and pain." *Id.*, Ex. B., Attach. 3 at 3.

Plaintiff filed his fourth grievance, like the two preceding, as a formal grievance. Here, Plaintiff renewed his protests about an insect-riddled mattress, but explained that on the morning of August 19, 2016, he complained to a sergeant of the situation, and that sergeant, after first bringing him sheets and blankets to wrap his purportedly infested mattress, came an hour later with a replacement mattress. *Id.*, Ex. B., Attach. 4 at 3. Plaintiff claimed that the sergeant dragged this replacement mattress "across the compound" while in transit to his cell. *Id.* When the sergeant arrived at Plaintiff's cell, Plaintiff claimed the sergeant was verbally abusive and left either Plaintiff's old mattress, his new one, or both outside, along with Plaintiff's sheets and blankets. *Id.*, Ex. B., Attach. 4 at 4. Plaintiff related that this forced him to use his "towel and

water to wipe of[f] all the bird dropping[s] on [his] sheets." For these alleged infractions, Plaintiff asked that the relevant corrections sergeant be fined and that Plaintiff also receive "$1[,]000 compensation for the suffering and ongoing condition." *Id.*, Ex. B., Attach. 4 at 3.

Plaintiff's fifth grievance reiterated the allegations of his first. However, unlike the first, which he hand-wrote on a blank piece of paper, Plaintiff's fifth grievance was initiated as a formal grievance. *Id.*, Ex. B., Attach. 5 at 3. Plaintiff requested that prison officials alleviate the purported telephone access problem by allowing prisoners three designated times during the day to make calls. *Id.*

Grievance Officer Lujan responded to each of these four formal grievances the next day, August 25, 2016. *Id.*, Ex. B at 2. Lujan reminded Plaintiff, in writing, that grievances would not be reviewed until Plaintiff initiated the process properly with an informal complaint. *Id.* Additionally, he advised Plainitff of NMCD policies related to abuse of the grievance process and attached the relevant portion of NMCD policies. *Id.*

### 3. Sixth grievance

Plaintiff initiated his final grievance properly, as an informal complaint. In the informal complaint, Plaintiff realleged mistreeatment by prison officials who had forced him "to sleep on a mattress with bed bugs and other insects," and on "sheets and blankets with bird shit." *Id.*, Attach. 6 at 3. Plaintiff submitted the informal complaint on September 9, 2016, and received a response from Major Rolando Valencia the same day. *Id.* Major Valencia adjudicated the informal complain as "resolved," as in his opinion, the "issue was investigated and resolved by Unit Manager Craig Cole on September 1, 2016. The investigation found that this issue was addressed appropriately by both security staff and medical staff." *Id.*

Grievance Officer Lujan received Plaintiff's formal grievance on September 13, 2016. *Id.*, Attach. 6 at 1. In the formal grievance, Plaintiff urged reconsideration of the matters discussed in his informal complaint, while also appending a protracted exposition of his view of the continuing investigation into his various complaints. *See id.*, Ex. B., Attach. 6 at 4-13. Lujan observed that in Plaintiff's "lengthy grievance," he alleged issues dealing with safety, sanitation, staff harrassment, medical care, and living conditions. *Id.*, Ex. B., Attach. 6 at 1. Nonetheless, Lujan recommended on September 13, 2016, that Plaintiff's formal grievance be denied, as Plaintiff "ma[de] many allegations, but failed to prove any of them." *Id.*

On September 15, 2016, Warden Kenneth Smith accepted Lujan's recommendation and denied Plaintiff's greivance. *Id.* Warden Smith's denial appeared on the same one-page form that contained Lujan's recommendation. *Id.* The form also reflected that it, along with both Lujan's recommendation and Warden Smith's decision, was returned to Plaintiff that same day – September 15, 2016. *Id.* And, *directly below* Warden's Smith denial, the form detailed the final step of the NMCD administrative process, titled "Department Appeal." *Id.* In this last section, the form allowed Plainitff to briefly state the reason for the appeal, and instructed Plaintiff to "return to grievance officer for processing." *Id.* This section, however, was never completed, as Plaintiff never exhausted his administrative remedies by propounding an appeal to the NMCD Cabinet Secretary or his designee, the Director of Adult Prisons. *See id.*; *see also id.*, Ex. F at 1-2 (affidavit of Orion Stafford, documenting that Plaintiff has not exhausted any grievance by pursuing an appeal to the NMCD Cabinet Secretary or his designee).

### B. Inexcusable Failure to Exhaust

Defendant NMCD has raised exhaustion as an affirmative defense, and they have proffered sufficient uncontroverted evidence to prove Plaintiff's failure to exhaust. *See Jones v.*

*Bock,* 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specifically plead or demonstrate exhaustion in their complaints."). Moreover, Plaintiff admits that he failed to exhaust his administrative remedies.

The PLRA's exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856 (citing *Jones*, 549 U.S. at 211; *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). "And that mandatory language means a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Id.* at 1856-57 (citing *Miller v. French,* 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")). To the contrary, the Supreme Court has carved out only one exception to the PLRA's mandatory edict: "the [administrative] remedies must indeed be 'available' to the prisoner." *Id.* at 1856.

Thus, with exhaustion having been raised and Plaintiff's failure to exhaust having been stipulated, the Court need only review whether or not administrative remedies were truly "available" to Plaintiff. The framework for this analysis was outlined by the Supreme Court in *Ross*, where the Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1858. An exploration of these three scenarios demonstrates why dismissal of Plaintiff's claims is appropriate.

### 1. Dead end

The first type of unavailability discussed in *Ross* is known as the "dead end" exception. As explained in *Ross*, "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. *Ross*

presented the following hypothetical to describe a "dead end" situation: "Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office - but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose." *Id.* *Ross* then concluded that "[w]hen the facts on the ground demonstrate that no [potential for relief] exists, the inmate has no obligation to exhaust the remedy." *Id.*

The record provides no support for a finding that the NMCD grievance procedure "operates as a simple dead end." *See id.* On the contrary, the Report contains numerous affidavits from officers detailing their efforts to accommodate Plaintiff's complaints, notwithstanding Plaintiff's inability to properly pursue the NMCD grievance procedure. *See, e.g.,* Def. NMCD's Report, Ex. C at 2-3 (affidavit of Unit Manager Craig Cole, documenting his investigation into Plaintiff's allegations), Ex. E at 3-4 (affidavit of Warden Kenneth Smith, detailing his involvement in the grievance process and steps he took beyond the grievance process to address Plaintiff's concerns). In the one instance where Plaintiff did properly pursue NMCD grievance procedure (his sixth grievance), Plaintiff's concerns were investigated by Major Valencia, Grievance Officer Lujan, and Warden Smith. *See id.*, Ex. B., Attach. 6. Thus, the NMCD grievance procedure offered Plaintiff the capacity to voice his concerns at multiple levels and to have his complaints investigated by multiple officials. This in no way typifies the dead end *Ross* cautioned against, and thus cannot excuse Plaintiff's failure to exhaust.

  **2. Opaque procedures**

The second form of unavailability emerges when an administrative scheme is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859. Or, put

another way, when relevant procedures are so confusing that no reasonable prisoner can use them, they are no longer "available," and exhaustion is not required. *See id.*

Here, NMCD's grievance procedure was not "so opaque" that Plaintiff could not use it. The NMCD grievance policy is straightforward, involving timely disposition and appeal at each step. *See* Def. NMCD's Report, Ex. A, Attach. 1 at 1-5. Even Plaintiff, despite his repeated inability to comply with the grievance procedure, has never argued that he was unable to understand it. To the extent Plaintiff attempted to explain his non-compliance, he attributed the faults to an inability to secure the proper forms from prison officials, rather than to a lack of understanding the procedure itself. Thus, Plaintiff's failure to exhaust cannot be excused based on "opaque procedures."

### 3. Interference by prison staff

The last type of unavailability discussed by *Ross* arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860. This type of interference can take various shapes, whether in the form of a procedural system that "trip[s] up all but the most skillful prisoners," or where prison officials mislead or threaten individual inmates "so as to prevent their use of otherwise proper procedures." *Id.* (internal citations and quotation marks omitted). In such circumstances, the PLRA's exhaustion requirement "poses no bar." *Id.*

Here, Plaintiff alleges numerous instances of misrepresentation or intimidation by prison officials. In one example, he claims that it is the culture of CNMCF "to put off, delay and[/]or create a scenario in which it would not allow the inmate to get the proper form to file the informal grievance within the 5 days stated in the policy." Pl.'s Resp. to Martinez Report ("Pl.'s

Resp.") 2, ECF No. 66. He explains that he "tried getting these forms from Defendants to be able to file on time, but was always denied these forms." *Id*. at 23.

Plaintiff also alleges that CNMCF staff intimidated him for availing himself of the grievance process. Specifically, he asserts that Unit Manager Cole, after initiating an investigation into Plaintiff's complaints, told Plaintiff, "you are not going to win here, the state will always win." *Id.* at 2. He contends that Cole then threatened him directly by stating, "if you complain again[,] I am going to lock you up in segregation and take away your good time." *Id.* But, according to Plaintiff, Cole did not stop there. Instead, Plaintiff claims that Cole then walked with Plaintiff to the "center of the pod" and yelled the following:

> This inmate is complaining every day that this unit is dirty and infested with insects[.] [I]f he does not stop writing complaints I personally will be coming back to this unit every day and checking cells. [I]f I find anything out of order I will write you up and lock you down and take away your good time.

*Id.*

Plaintiff makes a similar claim against Major Valencia, alleging that when he went to Major Valencia's office to sign the informal complaint for his sixth grievance, Major Valencia attempted "to create an intimidating situation where [Plaintiff] would not ask questions." Pl.'s Second Resp. to Martinez Report ("Pl.'s Second Resp.") 11, ECF No. 78. In fact, as he left the office, Plaintiff claims that Major Valencia warned him, "you better stop your complaints or you're going to segregation and will lose your good time." *Id.*

These allegations, if proven, might represent precisely the type of interference by prison staff that the *Ross* court described. But these allegations could only constitute interference if they, in fact, *interfered.* That is decidedly not the case. Rather, the veracity of Plaintiff's assertions is immaterial, as Plaintiff's ability to take advantage of the grievance process was plainly *not* interfered with. Thus, the undersigned need not indulge the implausibility of, nor the

14

myriad incongruities contained within, Plaintiff's allegations. It is enough for this Court to emphasize instead that Plaintiff submitted *six* total grievances, on *three* separate occasions, in *less than a three week* span. *See* Def. NMCD's Report 14-17. Despite Cole's purported threats against him on September 1, 2016, Plaintiff persisted in filing his sixth grievance just one week later, on September 9, 2016. And in spite of Major Valencia's supposed threats, Plaintiff appealed Major Valencia's decision to Grievance Officer Lujan, where it was also reviewed by Warden Smith. *See* Def. NMCD's Report, Ex. B., Attach. 6 at 1. If any machination, misrepresentation, or intimidation indeed was employed by CNMCF in an effort to deter Plaintiff from pursuing the NMCD grievance process, it failed because the record undisputedly shows that Plaintiff was not deterred.

Plaintiff's Complaint ultimately fails not because administrative remedies were constructively unavailable, but because Plaintiff elected not to pursue them properly or to completion. In the one instance where Plaintiff followed NMCD grievance procedure - his sixth grievance (which CNMCF officials reviewed despite it being late) – Plaintiff *chose* not to complete the final step of the grievance process, despite the instructions for doing so being clear, unmistakable, and provided to Plaintiff on the face of the form. *See id.* By his own admission, Plaintiff chose instead to circumvent the grievance process and write directly to the NMCD Cabinet Secretary seeking relief outside the grievance process. *See* Pl.'s Second Resp. 5. Doing so did not exhaust Plaintiff's readily available administrative remedies, and cannot now save Plaintiff from the PLRA's mandatory bar.

## IV. CONCLUSION

No genuine dispute exists as to whether Plaintiff exhausted available administrative remedies, and therefore, the PLRA entitles Defendants to judgment as a matter of law. The Court **THEREFORE RECOMMENDS:**

(1) summary judgment be **GRANTED** to Defendants;

(2) all of Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE** for Plaintiff's failure to exhaust administrative remedies; and

(3) all other pending motions be **DENIED AS MOOT**.

**IT IS SO RECOMMENDED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**